**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EZEQUIEL GONZALEZ,
JOEL VIGIL RODRIGUEZ,
ROLANDO RAMIREZ FUENTES,
ENIS SULEIMA LUNA ARDILA,
ALEX ESTUARDO HERNANDEZ PEREZ,
VLADIMIR IZMAILOV, and
DOMINGO TOT QUIP,
*on behalf of themselves and others similarly situated,*

*Plaintiffs*[1],

v.

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525;

MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525;

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th St., SW Washington, DC 20024; and

DAVID J. VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement
500 12th St., SW Washington, DC 20024;

*Defendants*.

Case No.

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiffs' residential addresses are being filed under seal with the Court in a separate Notice of Filing.

## INTRODUCTION

1. Defendant U.S. Immigration and Customs Enforcement ("ICE") has a de facto policy of failing to return property seized from people detained for civil immigration purposes, depriving people of their property long after any legitimate governmental interest in the property has expired (the "De Facto Policy"). Plaintiffs bring this action to challenge the De Facto Policy.

2. Since January 2025, ICE has routinely failed to return important items seized from people detained for civil immigration purposes after releasing them. This property includes government-issued documents, such as passports, Employment Authorization Documents ("EAD" or "EADs"), and driver's licenses, as well as other personal items, including money, jewelry, cell phones, car keys, and clothing. ICE has deprived people of such items for far longer than any conceivable governmental interest would justify, often months after the individuals were released from ICE custody.

3. Across the country, federal judges have held government officials in contempt, or threatened to do so, due to ICE's failure to return items that had been seized from people released from ICE detention. Journalists and immigration lawyers have reported a similar practice.

4. The Named Plaintiffs are seven people who fell victim to the De Facto Policy. Each Plaintiff was arrested and ultimately detained for civil immigration reasons. Plaintiffs' items were seized incident to their detention, and ICE obtained custody over the property. Plaintiffs were then released from detention without many of the items that ICE obtained, including identification cards and other documents needed for them to maintain or gain employment. At least five months have passed since each Plaintiff was released from ICE custody, and all Plaintiffs are still missing important property, despite requesting its return. Plaintiffs have expended significant resources to replace or regain their possessions. Without them, Plaintiffs have lost jobs, feared leaving their

homes (due to their lack of documentation), and suffered other serious personal and economic hardships.

5. The De Facto Policy, including its application to Plaintiffs and their property, is unconstitutional.

6. Even if ICE lawfully seizes property from a person incident to detaining them, and then lawfully holds that property for inventory purposes while the person is in ICE custody, those rationales expire once the owner is released.

7. "If the rationales that justified the initial retention of the plaintiffs' effects dissipated, and if no new justification for retaining the effects arose, then the Fourth Amendment oblige[s] [the government] to return the plaintiffs' effects." *Asinor v. District of Columbia*, 111 F.4th 1249, 1256 (D.C. Cir. 2024). ICE has failed to do this.

8. The De Facto Policy, including its application to Plaintiffs and their property, is also arbitrary and capricious under the Administrative Procedure Act ("APA"). It authorizes officials to withhold items when ICE has no legitimate reason for doing so.

9. ICE has written directives governing its handling of property, but they have not resulted in ICE complying with its legal duties.

10. Two sets of written directives are relevant.

11. *First*, when ICE seizes *documents* from a person detained for civil immigration purposes, the written directive concerning the handling of the property when the person is released is ICE Policy No. 11311 (the "Confiscation Directive"). *See* U.S. Immigration and Customs Enforcement, Policy No. 11311, Confiscation and Return of Original Documents, § 1.1 (Jan. 13, 2023) [hereinafter the "Confiscation Directive"].

12. The De Facto Policy demonstrates how ICE has operationalized the Confiscation Directive and shows that the agency treats it as authorizing officers to choose whether to return seized documents, even if ICE lacks a legitimate justification for not giving them back. To the extent that the Confiscation Directive did indeed authorize ICE to retain documents in these scenarios, it would be unlawful under the Fourth Amendment and arbitrary and capricious under the APA.

13. Properly read, however, the Confiscation Directive does not authorize such conduct. Instead, the Confiscation Directive states that ICE's enforcement officers, commonly known as ERO officials or EROs, must "[e]nsur[e] that decisions to retain documents are based on a clearly articulated operational need[.]" Confiscation Directive, § 4.4(3). The De Facto Policy, when applied to documents, violates this mandate and, as such, is unlawful under the *Accardi* doctrine—in addition to offending the Fourth Amendment and constituting arbitrary and capricious conduct for the reasons discussed above.

14. *Second*, for *property other than documents belonging to people released from custody*, several different written detention standards (the "Detention Directives") instruct facilities housing immigration detainees on how to handle detainee property. U.S. Immigration and Customs Enforcement, 2011 Operations Manual ICE Performance-Based National Detention Standards (Dec. 2016) [hereinafter the "PBNDS"]; U.S. Immigration and Customs Enforcement, National Detention Standards (2026) [hereinafter the "NDS"]; U.S. Immigration and Customs Enforcement, Non-Dedicated Intergovernmental Detention Standards (Mar. 2025) [hereinafter "NDIDS"]. Which particular standard applies depends on where the person is detained, but all such standards require the safeguarding and return of detainees' property upon their release, absent an ongoing, legitimate governmental interest. ICE consistently defies this mandate no matter

where the property is held. The De Facto Policy thus demonstrates that ICE has implemented the Detention Directives in the same way as it has implemented the Confiscation Directive: to authorize agents to withhold property even where ICE has no legitimate basis for doing so.

15. To the extent the Detention Directives authorized this approach to non-document property, the Detention Directives would violate the Fourth Amendment and constitute arbitrary and capricious agency action under the APA.

16. But here again, ICE's implementation of its written directives, in this case the Detention Directives, violates their plain text. Thus, the De Facto Policy as applied to non-document property (just like when applied to documents) is unlawful under *Accardi*, not to mention the Fourth Amendment and APA.

17. The upshot is this: The De Facto Policy, whether applied to documents or any other form of property, is unlawful several times over.

18. Plaintiffs, on behalf of themselves and other similarly situated individuals, bring this case to contest the De Facto Policy. They seek the return of items that ICE unlawfully failed to return to them as well as safeguards to prevent ICE from continuing to unreasonably deny people their property.

## JURISDICTION & VENUE

19. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

20. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity, and also proper under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events occurred in this district.

## PARTIES

### Plaintiffs

21. **Plaintiff Ezequiel Gonzalez ("Gonzalez")** came to the United States from Venezuela in 2022 and currently resides in Indianapolis, Indiana. Gonzalez was arrested and placed in ICE custody in September 2025 and released on March 3, 2026. ICE has not returned property that was seized from Gonzalez upon his arrest, including his passport, Social Security Card, and EAD.

22. **Plaintiff Joel Vigil Rodriguez ("Vigil")** is a citizen of El Salvador who came to the United States seven years ago and currently lives in Maine. ICE agents arrested him on January 20, 2026, and detained him until February 13, 2026, when he was released on bond. ICE has not returned property it seized when it arrested Vigil, including his phone, car keys, AirPods, coat, or wallet, which contained two El Salvador driver's licenses (one for motorcycles, the other for trailers).

23. **Plaintiff Rolando Ramirez Fuentes ("Ramirez")** came to the United States from Cuba 46 years ago, when he was eleven years old, and currently resides in Tampa, Florida. ICE arrested Ramirez on July 23, 2025 and released him on April 28, 2026. ICE has not returned property seized from Ramirez upon his arrest, including his Social Security Card and Florida driver's license.

24. **Plaintiff Enis Suleima Luna Ardila ("Luna Ardila")** came to the United States in or about January 2021, seeking asylum from Colombia. She currently lives in Indianapolis, Indiana. ICE arrested Luna Ardila on December 18, 2025, and released her on February 23, 2026. ICE has not returned property seized from Luna Ardila upon her arrest, including her state-issued ID, EAD, Colombian passport, Social Security Card, and learner's permit.

25. **Plaintiff Alex Estuardo Hernandez Perez ("Hernandez")** came to the United States seeking asylum from Guatemala. He currently lives in Indianapolis with his wife. Hernandez was arrested on February 7, 2026, subsequently detained by ICE, and then released on or around February 26, 2026. ICE has not returned property seized from Hernandez upon his arrest, including his state-issued ID and EAD.

26. **Plaintiff Vladimir Izmailov ("Izmailov")** is a Ukrainian-born Russian citizen who came to the United States to seek asylum. He currently lives with his wife and two children in Sacramento, California. ICE arrested him on November 1, 2025 and released him on April 18, 2026. ICE did not return property seized from Izmailov upon arrest, including his wedding band, belt, wallet, driver's license, and EAD.

27. **Plaintiff Domingo Tot Quip ("Tot Quip")** is from Guatemala and has resided in the United States for three years. He currently lives in Portland, Maine. ICE arrested him on January 21, 2026, and, notwithstanding a federal court order barring his removal from the United States, deported him to Guatemala on January 28, 2026, before returning him to the United States on August 13, 2026. When Tot Quip reentered the United States, ICE returned some of the items it had seized from him during his arrest but not all of them. ICE has not returned most of the cash that Tot Quip had on his person at the time of his detention, his backpack, phone charger, headphones, or clothes.

## Defendants

28. **Defendant United States Department of Homeland Security ("DHS")** is a federal agency responsible for administering and enforcing the immigration laws, including through its component agency U.S. Immigration and Customs Enforcement. DHS maintains its principal place of business in Washington, D.C.

29. **Defendant Markwayne Mullin ("Mullin")** is the Secretary of the United States Department of Homeland Security. He is sued in his official capacity.

30. **Defendant United States Immigration and Customs Enforcement ("ICE")** is a component agency of DHS. ICE maintains its principal place of business in Washington, D.C.

31. **Defendant David J. Venturella ("Venturella")** is the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity.

## FACTS

32. When ICE detains a person for civil immigration purposes, it generally confiscates the person's property for the duration of the detention. Upon releasing people, ICE has a legal duty to return the property it seized unless a new justification for retaining it emerges. Doing otherwise is not only illegal but also imposes serious hardships on the people affected (Part I). ICE violated this mandate in its handling of each Plaintiff's property, causing them substantial injuries (Part II). This misconduct arises from a nationwide De Facto Policy whereby ICE authorizes its officials to withhold seized property even when they lack a justification (Part III). The De Facto Policy reflects the way ICE has operationalized its written directives governing property retention; however, this approach defies the directives' plain text. (Part IV). The consequences extend beyond Plaintiffs, affecting a class of similarly situated individuals (Part V).

### I. ICE Has a Legal Obligation To Return Seized Items It No Longer Needs and Imposes Serious Hardship When It Violates That Mandate.

33. ICE generally seizes property from the people it detains and holds what it confiscates while the individuals remain in ICE custody. To the extent holding property in such circumstances is justified by the government's interest in inventorying property or other concerns

related to the owner's custodial status, those interests expire when ICE releases the person in custody.

34. At that point, unless another justification for retaining the property has emerged, "the Fourth Amendment oblige[s] the [government] to return the plaintiffs' effects." *Asinor*, 111 F.4th at 1256.

35. Failing to return property without justification is also arbitrary and capricious under the APA, since it imposes hardship on individuals without reason.

36. Common interests that the government cites to justify retaining seized property past the owner's release include determinations that the item is needed as evidence in civil or criminal enforcement proceedings or that it is contraband, which in the case of documents may include records that are forged, obtained via fraudulent means, or otherwise illegal for the individual to possess.

37. ICE has also asserted that when it obtains seized documents issued by foreign governments (such as passports) or documents verifying an individual's identity, citizenship or nationality, or copies thereof, it relies on them to facilitate an individual's departure from the United States if an individual receives a final order of removal or is allowed to leave, through a legal process called voluntary departure or otherwise (collectively, "Removal").

38. Whatever interest ICE may have in retaining identification documents to facilitate Removal, this interest does not always require it to keep every document it seizes. For instance, if ICE confiscates a person's valid passport, ICE would have no need to retain other identification documents for purposes of effectuating a Removal. The passport would, on its own, accomplish all the objectives ICE asserts justify retaining documents to facilitate Removal.

39. Even where ICE asserts that it must hold one or more of a person's identification documents, it has no plausible reason not to provide the owner with a certified copy of those documents. Indeed, the Confiscation Directive requires as much, stating that, "[t]he noncitizen shall be provided with a certified copy of their documents with a notation that ICE is in possession of the original." *See* Confiscation Directive, § 2.2.

40. When ICE fails to return someone's cell phone, that person may have to spend money to replace it and deal with the substantial inconvenience of going without one. Similar injuries can arise when ICE fails to return other non-document property, such as car keys or clothing.

41. When ICE fails to return EADs, driver's licenses, and other documents, it imposes substantial hardships on the owner.

42. When ICE fails to return someone's EAD, that person may be unable to find or maintain employment.

43. When ICE fails to return someone's driver's license, that person's employment opportunities and freedom of movement may be limited.

44. When ICE fails to return someone's green card (formally referred to as alien registration receipt cards), that person is exposed to criminal prosecution under 8 U.S.C. § 1304(e), which asserts that all lawful permanent residents over the age of eighteen "shall at all times carry" such documentation. 8 U.S.C. § 1304(e).

45. The risk of prosecution is real. The Trump Administration has indicated that "failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code [8 U.S.C. §§ 1301–1306]" will be "treated as a civil and criminal enforcement priority." Protecting the American People Against Invasion, 90 Fed. Reg. 8443, 8444 (Jan. 20,

2025); *see also* Alien Registration Form and Evidence of Registration Interim Final Rule, 90 Fed. Reg. 11793, 11795 (Mar. 12, 2025) (explaining its purpose in "[e]nsur[ing] that failure to comply with the legal obligations of 8 U.S.C. 1301–1306 is treated as a civil and criminal enforcement priority."); *id.* at 11794 (providing that "Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both."); *see, e.g.,* Gregory Pratt, *ICE tickets Chicago man with legal residency $130 for not having his papers on him; 'It's not fair … I'm a resident.'*, Chicago Tribune (Oct. 13, 2025), https://www.chicagotribune.com/2025/10/13/ice-fines-chicago-man-for-not-having-papers-on-him.

46. There are significant fees associated with obtaining replacement permanent resident cards, EADs, and other immigration documents, *see* 8 C.F.R. § 106.2, and acquiring such documents can take months or longer, *see Case Processing Times*, U.S. Citizenship and Immigration Services, egov.uscis.gov/processing-times (last visited Oct. 6, 2026) (estimating that 80% of requests for a replacement Permanent Resident Card are processed within six months, 80% of requests for replacement EADs for asylees are completed in approximately over eighteen months, and that applications for replacement EADs in certain categories can take over a year).

47. In some circumstances, a replacement EAD might also provide work authorization for a shorter period than the original EAD.

## II. ICE Has Failed To Return Plaintiffs' Property Without Justification, Imposing Ongoing, Substantial Harm.

48. Every Plaintiff is missing property due to the De Facto Policy. Each was arrested, placed in ICE custody, and released without important possessions, even though ICE had no conceivable reason not to return the items it failed to provide.

### A. Plaintiff Gonzalez

49. Plaintiff Gonzalez was arrested in September 2025 and routed to ICE custody for civil immigration purposes, where he remained until his release pursuant to a federal judge's order on March 3, 2026.

50. Gonzalez has a pending removal order but has appealed it.

51. When ICE transferred Gonzalez between different detention facilities, it confirmed his identity by presenting him with a clear plastic bag containing his passport (in which Gonzalez had stored his Social Security Card) and his EAD.

52. When ICE released Gonzalez, it did not return his passport, Social Security Card, or EAD.

53. Gonzalez's attorney conducted extensive outreach to recover these items, but ICE said that there were no documents in his file and did not respond to additional outreach efforts.

54. ICE did not provide any justification for its failure to return Gonzalez's property, and it lacks a plausible rationale.

55. The documents ICE has failed to return were not forged or obtained via fraudulent means. Gonzalez has a legal right to possess all of them.

56. The circumstances of the arrest provided no reason to believe that the documents were stolen or otherwise evidence of a crime; indeed, Gonzalez is not facing any criminal charges, let alone ones related to the items ICE took.

57. Gonzalez is aware of no reason why the items ICE seized would be needed as evidence in a civil proceeding or in a criminal proceeding (which, again, he is not currently facing).

58. To the extent ICE believes it needs Gonzalez's legal documents to facilitate Removal, if he is ordered to be removed, it has offered no reason why it could not rely on copies of those documents and return the originals. Nor has ICE explained why a potential future

Removal requires it to retain all the legal documents it took from Gonzalez rather than, at most, a subset.

59. ICE did not provide Gonzalez with copies of his documents, and he has not been able to replace them.

60. Without an EAD, Gonzalez has been unable to find work and has spent months trying to obtain a new EAD without success.

61. In sum, more than seven months after releasing Gonzalez, ICE has failed to return property seized from him upon his detention that ICE has no justification for denying him.

### B. Plaintiff Vigil

62. ICE agents came to Plaintiff Vigil's worksite on January 20, 2026. They questioned him and his colleagues and arrested him on alleged violation of civil immigration laws and confiscated the items on his person as part of the arrest.

63. Vigil successfully obtained habeas relief, securing a federal court order requiring that he receive a bond hearing before an immigration judge. That hearing took place on February 10, 2026, and resulted in Vigil's release on February 13, 2026.

64. The government has initiated removal proceedings against Vigil. His application for a Withholding of Removal is pending. No final order of removal has been issued.

65. When it freed Vigil from custody, ICE failed to return his car keys, phone, AirPods, coat, and wallet, which contained two El Salvador driver's licenses, one for driving motorcycles and another for trailers.

66. ICE provided no explanation for not providing Vigil with these items and it has no plausible justification.

67. None of the items is contraband. The circumstances of the arrest provided no reason to believe that the items were stolen or otherwise evidence of a crime; indeed, Vigil is not facing any criminal charges, let alone ones related to the items ICE took.

68. Neither of Vigil's licenses is forged or obtained through fraudulent means. He is legally entitled to possess both.

69. Vigil is aware of no reason why the items ICE seized would be needed as evidence in a civil proceeding or in a criminal proceeding (which again, he is not currently facing).

70. To the extent ICE believes it needs Vigil's licenses to facilitate Removal, if he is ordered to be removed, it has offered no reason why it could not rely on copies of those documents and return the originals. In any case, ICE also did not provide Vigil with copies of his licenses.

71. Vigil's lawyers asked ICE to return the property multiple times, but ICE neither complied nor offered an explanation for its refusal.

72. Vigil's congressional representative, Congresswoman Chellie Pingree, also asked ICE to return Vigil's items.

73. ICE originally told Congresswoman Pingree that all of Vigil's property had been returned. It later told her they were conducting a full property audit, but that was in April, and since then ICE has neither returned Vigil's property nor offered any explanation for its failure to do so.

74. Vigil has spent thousands of dollars on legal fees and replacement costs to obtain his seized items.

75. In sum, eight months after releasing Vigil, ICE has failed to return property seized from him upon his detention that it has no justification for denying him.

**C. Plaintiff Ramirez**

76. Plaintiff Ramirez came to the United States 46 years ago and, while he received a Removal order, has been released on Order of Supervision since 2004.

77. On July 23, 2025, ICE detained Ramirez outside his workplace, confiscated property on his person, and held him until a federal judge ordered his release on April 28, 2026.

78. ICE did not return several of Ramirez's items upon his release, including his Social Security Card, and Florida's driver's license.

79. Ramirez asked for these items back but has not received them. ICE provided no explanation for its conduct and has no plausible justification for it.

80. The documents ICE failed to return were not forged or obtained via fraudulent means. Ramirez has a legal right to possess all of them.

81. The circumstances of the arrest provided no reason to believe that the documents were stolen or otherwise evidence of a crime; indeed, Ramirez is not facing any criminal charges, let alone ones related to the items ICE took.

82. Ramirez is aware of no reason why the items ICE seized would be needed as evidence in a civil proceeding or in a criminal one (which, again, he is not currently facing).

83. To the extent ICE believes that it needs Ramirez's legal documents to facilitate Removal, if Ramirez is ordered to be removed, it has offered no reason why it could not rely on copies of those documents and return the originals. Nor has ICE explained why a potential future Removal requires it to retain all the legal documents it took from Ramirez rather than, at most, a subset.

84. ICE did not provide Ramirez with copies of his documents.

85. Ramirez's inability to access documents has impeded his ability to secure work. That has prevented him from obtaining medical care for his heart condition.

86. Ramirez's inability to work also deprived him of the resources needed to afford housing. He is currently homeless.

87. In sum, more than five months after releasing Ramirez, ICE has failed to return property seized from him upon his detention that ICE has no justification for denying him.

**D. Plaintiff Luna Ardila**

88. Plaintiff Luna Ardila was detained by ICE for civil immigration purposes after a regularly scheduled check-in with immigration officers on December 18, 2025. ICE confiscated items on her person as part of the detention and held her until February 23, 2026.

89. When Luna Ardila was released, ICE did not return several of her personal documents, such as her state-issued ID, EAD, Colombian passport, Social Security Card, and her learner's permit.

90. In the seven months since her release, her immigration attorney and others have made repeated efforts to get her items back, including regular requests from her attorney to ICE to get the property back, with no success.

91. Luna Ardila also paid another legal professional roughly two hundred dollars to try to get her documents back, to no avail.

92. ICE has provided no justification for its failure to return Luna Ardila's property, nor does a plausible one exist.

93. The documents ICE has failed to give back were not forged or obtained via fraudulent means. Luna Ardila has a legal right to possess all of them.

94. The circumstances of the arrest provided no reason to believe that the documents were stolen or otherwise evidence of a crime; indeed, Luna Ardila is not facing any criminal charges, let alone ones related to the items ICE took.

95. Luna Ardila is aware of no reason why the items ICE seized would be needed as evidence in a civil proceeding or in a criminal proceeding (which, again, she is not currently facing).

96. To the extent ICE believes it needs Luna Ardila's legal documents to facilitate Removal, if she is ordered to be removed, it has offered no reason why it could not rely on copies of those documents and return the originals. Nor has ICE explained why a potential future Removal requires it to retain all the legal documents it took from Luna Ardila rather than, at most, a subset.

97. ICE did not provide Luna Ardila with copies of her documents.

98. Without her documents and identification, Luna Ardila cannot perform basic life activities, like obtaining her driver's license and driving.

99. She cannot get better paying jobs without her EAD and has had to turn down roughly five jobs since she was released in February, including one that paid double her current wage and had better benefits, because she could not provide proof of work authorization to these jobs. Her EAD was not set to expire until 2029, and she was quoted $1,000 as the cost of getting a replacement.

100. Luna Ardila also is afraid that if she encounters ICE again, she will be unable to prove her legal status or identity and will be detained again.

101. In sum, more than seven months after releasing Luna Ardila, ICE has failed to return property seized from her upon her detention that ICE has no justification for denying her.

**E. Plaintiff Hernandez**

102. Hernandez has applied for asylum and cannot return to Guatemala because he has been targeted by a gang that killed his father. His asylum claim was denied, but he has a pending appeal.

103. Hernandez was detained by ICE after a traffic stop on February 7, 2026, and was taken to a detention facility in Brazil, Indiana, where he remained for about a week before ICE moved him to a detention facility in Kentucky. He was released around February 26, 2026.

104. When Hernandez was stopped, police officers seized property on his person. While at the detention facility in Brazil, Hernandez saw ICE officers place detainees' property in folders and transparent bags. When ICE took him to Kentucky, Hernandez saw ICE officials transport with him a plastic bag containing items belonging to him, though he was not allowed to access the bag.

105. When ICE released Hernandez, it returned some of his items, including his wallet, but not the ID and EAD that he stored inside it.

106. ICE did not provide any reason for failing to return his ID and EAD.

107. ICE has no plausible justification for its conduct.

108. The documents ICE failed to return were not forged or obtained via fraudulent means. Hernandez has a legal right to possess all of them.

109. The circumstances of the arrest provided no reason to believe that the documents were stolen or otherwise evidence of a crime.

110. He is aware of no reason why the items ICE seized would be needed as evidence in a civil proceeding or in a criminal proceeding.

111. To the extent ICE believes it needs Hernandez's legal documents to facilitate Removal, if he is ordered to be removed, it has offered no reason why it could not rely on copies of those documents and return the originals. Nor has ICE explained why a potential future Removal requires it to retain all the legal documents it took from Hernadez rather than, at most, a subset.

112. ICE did not provide Hernandez with copies of his documents.

113. When he got home, Hernandez asked a friend who speaks English to call the ICE office where he was detained in Kentucky to try to get his EAD and ID back, but was given a

different number to call, and the person at that number said he should have his attorney deal with getting his items back.

114. Hernandez has been working with an attorney to try to get his EAD and ID back, but it has been an expensive, long, and, so far, unsuccessful process. He was told that it would cost $1,000 to apply for a new EAD.

115. Hernandez is scared to leave his house without his missing documents. He fears that ICE, which has a large presence in Indianapolis and often asks people for their identification and documents, will detain him again for not having any ID.

116. There is no Guatemalan consulate in Indiana, so Hernandez would have to travel to Ohio to get a replacement ID, and he is scared to travel to Ohio because of ICE. He also cannot afford to miss work to travel to get a new ID.

117. Hernandez has also suffered economic harm due to ICE's failure to return his property. Hernandez was about to start a higher paying job before he was detained; without his EAD, he lost that opportunity.

118. In sum, more than seven months after releasing Hernadez, ICE has failed to return property seized from him when he was detained that it has no justification for denying him.

**F. Plaintiff Izmailov**

119. Izmailov is a Ukrainian-born Russian citizen who entered the United States in 2023 when he was scheduled for an interview on his asylum claim. He was granted work authorization.

120. On November 1, 2025, ICE detained Izmailov at a road checkpoint in Laredo, Texas and confiscated property on his person, including his driver's license, EAD, wedding band, wallet,

belt, and phone. He was held in Texas, Arizona, and California before eventually being released on April 18, 2026.

121. When Izmailov was released, ICE returned his cell phone but not his wallet or belt (both of which he saw ICE officers throw in the trash around the time of his initial detainment), his driver's license, EAD, or wedding ring.

122. Izmailov asked for his property back and was told that ICE had no record of his wedding band but would mail the documents to the ICE officer he had interacted with for his asylum claim.

123. Izmailov contacted his Intensive Supervision Appearance Program ("ISAP") officer who said she did not receive his property. She sent a request to ICE, and ICE replied that Izmailov's property had likely been destroyed.

124. ICE has given Izmailov no justification for its failure to return his property.

125. ICE has no plausible justification for its conduct.

126. None of the property ICE failed to return is contraband and Izmailov is aware of no reason why they would be needed as evidence in a civil or criminal proceeding. Indeed, Izmailov is not facing any criminal charges, let alone ones that the items ICE failed to give back could plausibly relate to.

127. The documents ICE failed to return were not forged or obtained via fraudulent means. Izmailov has a legal right to possess all of them.

128. The circumstances of the arrest provided no reason to believe that the items ICE failed to return were stolen or otherwise evidence of a crime.

129. Izmailov is aware of no reason why the items ICE withheld would be needed as evidence in a civil proceeding or in a criminal proceeding (which, again, he is not currently facing).

130. To the extent ICE believes it needs Izmailov's legal documents to facilitate Removal, if he is ordered to be removed, it has offered no reason why it could not rely on copies of those documents and return the originals. Nor has ICE explained why a potential future Removal requires it to retain all the legal documents it took from Izmailov rather than, at most, a subset.

131. ICE also did not provide Izmailov with copies of his documents.

132. The loss of this property has caused Izmailov significant harm.

133. His wedding ring holds irreplaceable sentimental value. And his finances are dire because he doesn't have his documents. He cannot get meaningful or stable employment without his EAD, and since he cannot work, he cannot afford to replace his EAD. He has a wife and two children, and they are borrowing money to pay rent. He also cannot drive because he does not have his license. Izmailov tried to replace his driver's license, but the California Department of Motor Vehicles would not issue him a new one without his EAD. Being unable to drive makes it even more difficult to support his family and engage in the basic necessities of life.

134. Izmailov is afraid that if he encounters ICE again and is unable to prove his legal status or identity, he will be detained again.

135. In sum, more than five months after releasing Izmailov, ICE has failed to return property seized from him when he was detained that it has no justification for denying him.

**G. Plaintiff Tot Quip**

136. Tot Quip came to the United States from Guatemala and has worked for three years as a dishwasher in Portland, Maine.

137. On January 21, 2026, Tot Quip was waiting for the bus to go to work when two masked ICE agents grabbed him, put him in an SUV, and transferred him to an ICE detention

center, first in Portland, then in Burlington, Massachusetts, and finally in Louisiana. As part of this seizure, ICE confiscated items on Tot Quip's person.

138. Tot Quip's attorneys filed a habeas petition on January 26, 2026. A federal judge granted it the next day and prohibited ICE from transferring Tot Quip outside the country. Nonetheless, after receiving the court's order, ICE put Tot Quip on a plane to Guatemala and did not facilitate his return from there to the United States until August 13, 2026.

139. ICE returned some of the property it seized from Tot Quip when it let him off the plane in Guatemala, and more when it brought him back to the United States, but not all. Although ICE realized Tot Quip had been wrongly removed on February 6, 2026, because ICE failed to return Tot Quip's passport when he arrived in Guatemala, it was unable to effectuate Tot Quip's return to the United States until Tot Quip was able to secure a new passport in Guatemala, delaying that return.

140. Even now, ICE has not returned many of the items it seized from Tot Quip when it detained him, including the majority of the cash Tot Quip had on him at the time of his detention, his phone charger, headphones, clothes, and backpack.

141. ICE has provided no justification for its handling of Tot Quip's property.

142. ICE officers told Tot Quip that they would return his items, but they have not done so.

143. ICE has no plausible justification for not returning the property.

144. None of the items ICE failed to return is contraband and Tot Quip is aware of no reason why they would be needed as evidence in a civil or criminal proceeding. Indeed, Tot Quip is not facing any criminal charges, let alone ones that the items ICE failed to give back could plausibly relate to.

145. More than eight months after its initial release of Tot Quip, ICE has failed to return property seized from him upon his detainment which ICE has no justification for denying him.

## III. ICE's Prolonged Deprivation of Plaintiffs' Items Arises from Its De Facto Property Return Policy.

146. ICE routinely fails to return property seized from people detained for civil immigration purposes, denying people their property long after any legitimate government interest in the property has expired. This practice has been documented by federal courts, journalists, and immigration lawyers. It is so ubiquitous that it constitutes a de facto policy.

### A. Federal judges across the country have ordered ICE to return property seized from individuals detained for civil immigration purposes.

147. Federal judges around the country have repeatedly held that ICE unlawfully retained property from people it released. Courts have ordered ICE to return this property, and even then, the agency has on many occasions continued to withhold the items.

148. This section discusses some of the many instances where courts have found that ICE unlawfully failed to return property.

149. In Minnesota, a federal judge found that government officials had, in multiple cases, "violate[d] the terms of" court orders "because they retained possession of the Petitioners' personal property collected during their arrest and detention without any lawful basis to do so." *J.B.C.O. et al., v. Bondi et al.*, Case No. 26-CV-00424, Dkt. 32 at 5 (D. Minn. Mar. 6, 2026) (addressing a series of cases implicating this issue, and the government's failure to return wallets, work permits, U.S. drivers' licenses, foreign drivers' licenses, passports, consular identification cards, other immigration documents, social security cards, debit and credit cards, cellphones, clothing and shoes, jewelry and watches, and other personal property).

150. Other federal judges in Minnesota have ordered the return of property in individual cases. *See, e.g., Narvaez Alvarez v. Easterwood*, Case No. 26-CV-00832, 2026 WL 327903, at *2 (D. Minn. Feb. 5, 2026); *Rigoberto S. J. v. Bondi*, Case No. 26-CV-00957, 830 F. Supp. 3d 882, 887 (D. Minn. 2026).

151. In West Virginia, a district court issued multiple orders for ICE to return personal property—including telephones, wallets, identification and immigration-paperwork, and bank cards—to a group of individuals who had been ordered released from ICE detainment. Eventually, the court issued a show-cause order, demanding that the government explain why it should not be held in contempt. *Serna Zarate et al., v. Mason, et al.*, Case No. 26-CV-00069, Dkt. 46 at 2–3 (S.D. W.V. Feb. 18, 2026).

152. In New York, a federal court ordered ICE to release Jonathan Cadena-Gallegos from ICE detention (where he had been held for civil immigration purposes) last February. The court's order "made unambiguously clear that Respondents were to 'release Petitioner with all of his belongings that are in Respondents' possession, including *but not limited to identification cards*, clothing, and money,'" but ICE retained Cadena-Gallegos's Social Security Card and work authorization document, *see Cadena-Gallegos v. Bondi*, Case No. 26-CV-00844, Dkt. 10 at (E.D.N.Y. Feb. 14, 2026) (emphasis in original) (referencing Dkt. 9), returning them only after additional intervention from the court, *see id.* at Dkts. 11–12.

153. In Texas, ICE detained Ana Maria Arnao Linares for civil immigration purposes until a federal court ordered her released in February 2026. *Arnao Linares v. Warden, et al.*, Case No. 26-CV-00340, Dkt. 5 (W.D. Tex. Feb. 18, 2026). The court also ordered ICE to return her identification documents, but ICE did not do so, prompting the court to issue a show cause order; ICE did not return the property for another month. *Id.* at Dkts. 9, 16.

154. In Colorado, ICE detained Javier Andres Garcia Cortes and, even after his release, retained his driver's license, EAD, and passport, prompting a federal court to order ICE to return these items and issue a show cause order when ICE did not initially comply. *Cortes v. Guadian*, Case No. 26-CV-00294, Dkt. 18 at 1 (D. Colo. Feb. 6, 2026). The court observed that ICE's conduct was "[a]t its worst," an "unjustifiable intransigence, where retention of Petitioner's belongings is tantamount to imposition of an additional and illegal condition the immigration judge didn't and hasn't imposed … And certainly it's a violation of an order from this Court." *Id.* at 2.

**B. Immigration lawyers and journalists have identified additional instances of ICE unlawfully retaining property seized from detainees.**

155. In public statements, immigration attorneys from different states have reported that, in their experience, ICE consistently fails to return documents to individuals released from ICE custody. *See* Bennett Haeberle et al., *Attorneys raise concerns over ICE confiscating detainees' IDs, personal documents*, NBC Chicago (Feb. 17, 2026), https://www.nbcchicago.com/news/local/attorneys-raise-concerns-over-ice-confiscating-detainees-ids-personal-documents/3895558/.

156. Another immigration lawyer, Daniel Chin, who works out of Indianapolis, identified multiple incidents of ICE retaining client property, including EADs, foreign passports, state driver's licenses, birth certificates, cellphones, wallets, and cash.

157. An investigation by NBC Chicago found that when detainees are ordered released, ICE often continues "to withhold the return of their drivers' licenses, state IDs, passports or work authorization forms." Haeberle et al., *supra*.

158. *Mother Jones* documented a pattern of ICE retaining property after releasing its owners from its custody, observing that the practice extends even to "refugees[] who enter the country legally after thorough vetting from abroad[.]" Julia Lurie, *ICE Took Their Papers—and*

*Won't Give Them Back*, Mother Jones (Feb. 24, 2026), https://www.motherjones.com/politics/2026/02/ice-detention-keeping-not-returning-immigration-documents-work-permits.

159. In its own investigation, the *New York Times* concluded that ICE routinely removes noncitizens from the United States without returning their identification, documents, money, phones, clothing, jewelry, and other valuables. Frances Robles, *Deported From the U.S., Some Haitians Are Left Broke and Stranded*, New York Times (Sept. 6, 2026), https://www.nytimes.com/2026/09/06/world/americas/haiti-deportees.html?smid=url-share.

## IV. ICE's Written Directives and the De Facto Policy.

160. ICE has two sets of written directives regarding the return of property seized from people placed in its custody.

161. The Confiscation Directive concerns the return of government-issued *documents* seized from individuals in ICE custody who are subsequently released.

162. The Detention Directives concern the return of *all other property* seized from individuals in ICE custody.

163. The De Facto Policy shows that ICE has implemented both sets of directives as if they vest agents with discretion to retain (or discard) seized items even without a justification for doing so. To the extent the Confiscation Directive and Detention Directives can be so construed, they are unlawful under the Fourth Amendment and arbitrary and capricious under the APA. However, that construction is wrong. Read properly, both sets of directives require ICE to return seized items when it has no legitimate justification to retain them. The De Facto Policy flouts this mandate, which provides another, independent basis for holding it unlawful.

### A. The Confiscation Directive

164. The Confiscation Directive sets out ICE's "policy and procedures for confiscating and returning original documents upon initiation of removal proceedings against any noncitizen, including Lawful Permanent Residents (LPRs)[.]" Confiscation Directive § 1.1. The term "documents" refers to, among other items, "passports, driver's licenses, social security cards, permanent resident cards (I-551), birth certificates, foreign identification cards, and school records." *Id.*

165. ICE "will generally confiscate any foreign and domestic government-issued documents . . . in the noncitizen's possession." *Id.* § 2.1.

166. As demonstrated by its actions, ICE has implemented the Confiscation Directive by vesting its officers with broad discretion not to return seized documents even where no legitimate governmental interest justifies such conduct, resulting in officers withholding documents unnecessarily or discarding them.

167. The Confiscation Directive as implemented by ICE is unconstitutional. It authorizes officers to deny people their documents even where the initial rationale for the seizure has dissipated and no new one emerged, contravening the D.C. Circuit's decision in *Asinor*. *See Asinor*, 111 F.4th at 1256.

168. The Confiscation Directive, as implemented by ICE, is arbitrary and capricious under the APA. It allows officers to deny people their documents for illegitimate reasons or no reason at all.

169. But ICE's operationalization of the Confiscation Directive misconstrues it. Properly read, the Confiscation Directive allows ICE to withhold seized documents only when justified by a "clearly articulated operational need." Confiscation Directive, §§ 4.4(3), 5.2.

Through its De Facto Policy, ICE routinely fails to return documents even where no such need exists.

170. The Confiscation Directive twice makes clear that ICE may retain seized documents only based on "clearly articulated operational need." Section 4.4(3), which lists ICE ERO officers' duties as to seized items, makes them "responsible" for "[e]nsuring that decisions to retain documents are based on a clearly articulated operational need." Confiscation Directive, § 4.4(3). Similarly, Section 5.2, which is titled "Return of Documents," states that if an ERO determines that a "document will be retained, such retention should be based upon a clearly articulated operational need." Confiscation Directive, § 5.2.

171. ICE also defies other Confiscation Directive mandates. For example, the Directive requires that when ICE confiscates documents, "[t]he noncitizen *shall* be provided with a certified copy of their documents with a notation that ICE is in possession of the original." Confiscation Directive, § 2.2 (emphasis added).

172. ICE routinely fails to provide such copies; indeed, ICE confiscated at least one government-issued document from each Plaintiff but provided copies to none of them.

**B. The Detention Directives**

173. ICE operates a nationwide civil immigration detention system through a network of detention facilities governed by several detention-standards frameworks. These are the Performance-Based National Detention Standards ("PBNDS"), first issued in 2011 and revised in 2016; the National Detention Standards ("NDS"), as revised and updated in 2025 and 2026; and the Non-Dedicated Intergovernmental Service Detention Standards ("NDIDS"), issued in 2025.

174. ICE requires facilities housing immigration detainees to comply with one of these detention-standards frameworks. Which framework applies to a particular facility generally

depends on the facility's governing contract, intergovernmental service agreement, or other detention-services arrangement with ICE.

175. ICE has also issued Hold Room Standards that apply uniformly to ICE hold rooms around the country. PBNDS, § 2.5.

176. Each standard imposes materially similar requirements regarding inventorying and safeguarding detainees' personal property while those items remain in government custody and the return of the property upon detainee release or transfer.

177. The Detention Directives require facilities to safeguard detainee property while detention is ongoing, transfer detainee property when detainees are moved between facilities, and return detainee property when detention ends unless ICE has a legitimate need to retain the property. *See, e.g.,* PBNDS, § 2.4(I).

178. ICE's conduct demonstrates that it has implemented the Detention Directives by vesting ICE agents and contractors with broad discretion not to return property after a person is released from ICE detention regardless of whether ICE has a legitimate reason for doing so, resulting in officials withholding property unnecessarily or discarding it.

179. The Detention Directives, as implemented by ICE, are unconstitutional, as they authorize officers not to return items even where the initial rationale for the seizure has dissipated, and no new one emerged, thereby contravening the D.C. Circuit's decision in *Asinor*. *See Asinor*, 111 F.4th at 1256.

180. The Detention Directives, as operationalized by ICE, are arbitrary and capricious under the APA, as they allow officials to withhold property for illegitimate reasons or no reason at all.

181. But ICE's operationalization of the Detention Directives misconstrues them. Properly understood, the Detention Directives allow ICE agents and contractors to withhold items only when doing so is justified by a governmental interest. *See, e.g.,* PBNDS, § 2.4. Through its De Facto Policy, ICE routinely fails to return property even where no such interest exists.

**V. Class Allegations**

182. Plaintiffs Vigil, Ramirez, Gonzalez, Luna Ardila, Hernandez, Izmailov, and Tot Quip bring this action as putative class representatives on behalf of themselves and all others who are similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

183. Plaintiffs seek to certify a class under Federal Rule of Civil Procedure 23(b)(2) defined as follows:

> All persons who have been or will be detained for civil immigration purposes on or after January 20, 2025, whose property ICE obtains in connection with that detention and whose property ICE does not return following the person's release from detention (including through removal from the United States) despite ICE lacking a governmental interest in depriving the person of that property post-release.

184. This class has two subclasses:

> ***Subclass 1***: All persons who have been or will be detained for civil immigration purposes on or after January 20, 2025, whose *document or documents* ICE obtains in connection with that detention and whose *document or documents* ICE does not return following the person's release from detention (including through removal from the United States) despite ICE lacking a governmental interest in depriving the person of the *document or documents* post-release.
>
> ***Subclass 2***: All persons who have been or will be detained for civil immigration purposes on or after January 20, 2025, whose *non-document property* ICE obtains in connection with that detention and whose *non-document property* ICE does not return following the person's release from detention (including through removal from the United States) despite ICE lacking a governmental interest in depriving the person of the *non-document property* post-release.

Each subclass meets all the requirements of Rule 23(a) for maintaining a class action.

185. Plaintiffs Vigil, Ramirez, Gonzalez, Luna Ardila, Hernandez, and Izmailov seek to represent Subclass 1.

186. Plaintiffs Vigil, Izmailov, and Tot Quip seek to represent Subclass 2.

187. The Plaintiff subclasses are so numerous that joinder is impractical. There are well over 40 recent documented instances of ICE retaining government-issued documents without justification and well over 40 instances of ICE retaining non-document property without justification, with numbers growing each day. These totals surpass the number of class members courts typically treat as sufficient to find joinder is impractical and satisfy the requirements of Rule 23(a)(1). Joinder is also impracticable because both subclasses include future members, as well as individuals who will be difficult to locate and join.

188. The claims of the class and each subclass share common issues of law and fact, including whether ICE's De Facto Policy violated their rights under the Fourth Amendment and whether the Policy is arbitrary and capricious because it allowed ICE to withhold their documents and other property without any legitimate governmental need. These common issues of law and fact can be resolved as to the class and each subclass as a whole and will not require individualized determinations or evaluation of the individual circumstances of any Plaintiff. Courts in this district routinely certify classes where plaintiffs have alleged widespread wrongdoing based on a policy or practice that affects all class members.

189. The claims of the putative class representatives are typical of the claims of members of the proposed class and subclass or subclasses that they seek to represent. Like other members of their putative class and subclass or subclasses, the representative plaintiffs have been harmed by, among other things, Defendants' seizure of and failure to return documents (Subclass 1) and other property (Subclass 2) in an unlawful and arbitrary and capricious manner.

190. The putative class representatives will fairly and adequately protect the interests of the putative class and subclass or subclasses that they seek to represent and have no interest that is antagonistic to the interests of members of the proposed class and subclass or subclasses that they seek to represent.

191. The attorneys representing the putative class and subclass representatives are experienced litigators with expertise in federal litigation, including class actions, immigration law, civil rights, and constitutional and administrative law. These attorneys should be appointed as class counsel.

192. Defendants have acted, threatened to act, and will act on grounds generally applicable to the putative class and subclasses, thereby making final equitable and declaratory relief appropriate to the class as a whole and each subclass. The Plaintiff class and subclasses therefore may be certified under Federal Rule of Civil Procedure 23(b)(2).

## CLAIMS FOR RELIEF

### COUNT I
**(Violation of the Fourth Amendment enforceable in equity; all Plaintiffs, and both Plaintiff subclasses against all Defendants)**

193. The Fourth Amendment prohibits government officials from retaining property once its legitimate interests in the items dissipate, even if the original acquisition of the items was lawful.

194. The De Facto Policy violates this constitutional mandate by authorizing ICE not to return property seized from people in its custody despite lacking any legitimate interest in those items.

195. The De Facto Policy has caused ICE to fail to return Plaintiffs' property as well as that of the class and members of both subclasses. ICE's failure to return this property has caused ongoing and irreparable harm to Plaintiffs and class and subclass members.

196. The Court has inherent equitable authority to enjoin ICE's violation of the Fourth Amendment.

**COUNT II**
**(Violation of the Fourth Amendment enforceable under the APA; all Plaintiffs, and both Plaintiff subclasses against all Defendants)**

197. The De Facto Policy constitutes agency action. It is also final agency action, as it reflects the consummation of ICE's decision-making and has effects on individuals' legal rights.

198. The APA authorizes the Court to set aside and enjoin agency action in violation of constitutional right. 5 U.S.C. § 706(2)(B).

199. The Fourth Amendment prohibits government officials from retaining property once its legitimate interests in the items dissipate, even if the original acquisition of the items was lawful.

200. The De Facto Policy violates this constitutional mandate by authorizing ICE not to return property seized from people in its custody despite lacking any legitimate interest in those items.

201. The De Facto Policy has caused ICE to fail to return Plaintiffs' property as well as that of members of the class and both subclasses. ICE's failure to return this property has caused ongoing and irreparable harm to Plaintiffs and class and subclass members.

202. Plaintiffs and members of the class and both subclasses have no other adequate remedy in a court besides this action.

**COUNT III**
**(APA, arbitrary and capricious agency action; all Plaintiffs, and both Plaintiff subclasses against All Defendants)**

203. The De Facto Policy constitutes agency action. It is also final agency action, as it reflects the consummation of ICE's decisionmaking and has effects on individuals' legal rights.

204. The APA authorizes the Court to set aside and enjoin arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A).

205. The De Facto Policy is arbitrary and capricious because it authorizes ICE not to return property seized from people in its custody despite lacking any legitimate interest in those items.

206. The De Facto Policy has caused ICE not to return Plaintiffs' property as well as that of members of the class and both subclasses. ICE's failure to return this property has caused ongoing and irreparable harm to Plaintiffs and class and subclass members.

207. Plaintiffs and members of the class and subclasses have no other adequate remedy in a court besides this action.

**COUNT IV**
**(APA / *Accardi*, agency action in violation of the Detention Directives; Plaintiffs Vigil, Izmailov, Tot Quip and Subclass 2 against all Defendants)**

208. The De Facto Policy constitutes agency action. It is also final agency action, as it reflects the consummation of ICE's decisionmaking and has effects on individuals' legal rights.

209. The APA authorizes the Court to set aside and enjoin arbitrary and capricious agency action, which, under the *Accardi* doctrine, includes agency conduct in violation of written directives.

210. The Detention Directives constitute binding internal policy documents that affect individual rights.

211. The De Facto Policy constitutes an incorrect interpretation and, indeed, violation of the Detention Directives, as it implements the Directives in a way that authorizes ICE not to return property even when it has no legitimate interest in it.

212. The De Facto Policy has caused ICE not to return Plaintiffs' property as well as that of the members of Subclass 2. ICE's failure to return this property has caused ongoing and irreparable harm to Plaintiffs and Subclass 2 members.

213. Plaintiffs and members of Subclass 2 have no other adequate remedy in a court besides this action.

**COUNT V**
**(APA / *Accardi*, agency action in violation of the Confiscation Directive; Plaintiffs Gonzalez, Vigil, Ramirez, Hernandez, Izmailov, Luna Ardila, and Subclass 1 Against All Defendants)**

214. The De Facto Policy constitutes agency action. It is also final agency action, as it reflects the consummation of ICE's decisionmaking and has effects on individuals' legal rights.

215. The APA authorizes the Court to set aside and enjoin arbitrary and capricious agency action, which, under the *Accardi* doctrine, includes agency conduct in violation of written directives.

216. The Confiscation Directive constitutes a binding internal policy document that affects individual rights.

217. The De Facto Policy constitutes an incorrect interpretation and, indeed, violation of the Confiscation Directive, as it implements the Confiscation Directive in a way that authorizes ICE not to return documents even when it has no legitimate interest in them.

218. The De Facto Policy has caused ICE not to return Plaintiffs' documents as well as those of the members of Subclass 1. ICE's failure to return these documents has caused ongoing and irreparable harm to Plaintiffs and Subclass 1 members.

219. Plaintiffs and Subclass 1 members have no other adequate remedy in a court besides this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court assume jurisdiction over this matter and grant the following relief:

A. Certify a class of all persons who have been or will be detained for civil immigration purposes on or after January 20, 2025, whose property ICE obtains in connection with that detention and whose property ICE does not return following the person's release from detention (including through removal from the United States) despite ICE lacking a governmental interest in depriving the person of that property post-release, and appoint Plaintiffs Gonzalez, Vigil, Ramirez, Luna Ardila, Hernandez, Izmailov, and Tot Quip as class representatives;

B. Certify a subclass of all persons who have been or will be detained for civil immigration purposes on or after January 20, 2025, whose document or documents ICE obtains in connection with that detention and whose document or documents ICE does not return following the person's release from detention (including through removal from the United States) despite ICE lacking a governmental interest in depriving the person of the document or documents post-release ("Subclass 1"), and appoint Plaintiffs Gonzalez, Vigil, Ramirez, Luna Ardila, Hernandez, and Izmailov as class representatives;

C. Certify a subclass of all persons who have been or will be detained for civil immigration purposes on or after January 20, 2025, whose non-document property ICE obtains in connection with that detention and whose non-document property ICE does not return following the person's release from detention (including through removal from the United States) despite ICE lacking a governmental interest in depriving the person of the non-document property post-release ("Subclass 2"), and appoint Plaintiffs Vigil, Izmailov, and Tot Quip as class representatives;

D. Appoint the undersigned as class counsel for the class defined in paragraph A, *supra*, and Subclasses 1 and 2;

E. Declare that the De Facto Policy violates the Fourth Amendment to the United States Constitution and is arbitrary and capricious under the APA;

F. Declare that the Confiscation Directive and the Detention Directives violate the Fourth Amendment to the United States Constitution and are arbitrary and capricious under the APA to the extent they authorize Defendants and their agents, employees or contractors, to refrain from returning property that they acquire from people detained for civil immigration purposes and that they no longer have any legitimate interest in;

G. Declare that the Confiscation Directive and Detention Directives, construed properly, require Defendants and their agents, employees, and contractors to return document and non-document property respectively, that they acquire from people detained for civil immigration purposes and that they no longer have any legitimate interest in;

H. Hold unlawful, enjoin, vacate, and stay under 5 U.S.C. § 705 the De Facto Policy;

I. Hold unlawful, enjoin, vacate, and stay under 5 U.S.C. § 705 the Confiscation Directive, and the Detention Directives (or any operational interpretation thereof) to the extent they authorize ICE not to return documents or other property in which it no longer has a legitimate governmental interest;

J. In the alternative to (I), enter an injunction that requires ICE to comply with the Detention Directives and Confiscation Directive and enjoins it from implementing those Directives to authorize ICE not to return documents or other property in which it no longer has a legitimate governmental interest;

K. Enter an injunction requiring ICE to: (1) return documents and other property it failed to return to Plaintiffs Vigil, Ramirez, Gonzalez, Luna Ardila, Hernandez, Izmailov, and Tot Quip; (2) return all documents and other property it has failed to return to members of each subclass, or if ICE believes it is entitled not to return any such items, to provide an explanation for the basis for not returning it; and (3) adopt safeguards to ensure ICE properly stores property it seizes from people detained for civil immigration purposes and returns those items when it no longer has a legitimate interest in them;

L. Award Plaintiffs reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable source of law; and,

M. Award any other such relief that this Court deems appropriate.

Dated: October 13, 2026

Respectfully submitted,

*/s/ Michael Perloff*

Kevin M. Fee*
Samuel B. Cole*
Kathleen Hickey*
Hirsh M. Joshi*
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Ste. 600
Chicago, IL 60601
(312) 201-9740
kfee@aclu-il.org
scole@aclu-il.org
khickey@aclu-il.org

Harold Craig Becker (D.C. Bar #371239)
Brian C. Ward (D.C. Bar #90046907)
Carolina Lima Porcile (D.C. Bar #90028798)
Normal L. Eisen (D.C. Bar #435051)
Stephen A. Jonas (D.C. Bar #90037069)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
craig@democracydefenders.org
brian@democracydefenders.org
lica@democracydefenders.org

Craig C. Martin
Aaron J.Hersh*
Mitchell Feldhake*
Joshua Martin*
Nathan Pflaum*
Tara Sohns*
Nicole Leon-Elvir*
WILLKIE FARR & GALLAGHER LLP
300 N. LaSalle Dr.
Chicago, Illinois 60654
(312) 728-9000
cmartin@willkie.com
ahersh@willkie.com
mfeldhake@willkie.com
jcmartin@willkie.com
npflaum@willkie.com
tsohns@willkie.com
nleon-elvir@willkie.com

Michael Perloff (D.C. Bar No. 1601047)
Laura K. Follansbee (D.C. Bar No. 1782046)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Ste. 420
Washington, D.C. 20045
(202) 457-0800
mperloff@acludc.org
lfollansbee@acludc.org
smichelman@acludc.org

Matthew J. Platkin*
Angela Cai
Ravi Ramanathan
Conor Bradley*
PLATKIN LLC
1 Gateway Ctr.
Newark, New Jersey 07102
Phone: (973) 561-1950
mplatkin@platkinllp.com
acai@platkinllp.com
rramanathan@platkinllp.com
cbradley@platkinllp.com

*Counsel for Plaintiff*

*Pro hac vice application forthcoming